2 N.Y.3d 166 (2004)
809 N.E.2d 651
777 N.Y.S.2d 422
In the Matter of EXCELLUS HEALTH PLAN, INC., Respondent,
v.
GREGORY V. SERIO, as Superintendent of Insurance, Appellant.
Court of Appeals of the State of New York.
Argued February 11, 2004.
Decided April 6, 2004.
*167 Eliot Spitzer, Attorney General, Albany (Victor Paladino, Caitlin J. Halligan, Daniel Smirlock and Nancy A. Spiegel of counsel), for appellant.
Hinman Straub P.C., Albany (Bartley J. Costello, III, Kimberly C. Lawrence and David W. Novak of counsel), for respondent.
Chief Judge Kaye and Judges G.B. Smith, Ciparick, Rosenblatt and R.S. Smith concur with Judge Read; Judge Graffeo concurs in part and dissents in part in a separate opinion.

*168 OPINION OF THE COURT
READ, J.
This appeal calls upon us to decide whether the Superintendent of Insurance may exercise his premium rate review and approval authority to disapprove or modify rate increases or decreases deemed approved under file and use provisions. For the reasons that follow, we conclude that he may not.

I.
In 1995, the Legislature enacted Insurance Law §§ 4321 and 4322 (L 1995, ch 504, § 12), which were intended to make affordable health care coverage available to individuals who buy their own health insurance. These provisions mandate all Insurance Law article 43 not-for-profit health insurers and health management organizations (HMOs) certified under Public Health Law article 44 (for purposes of this decision, referred to collectively as "insurers") to offer, on an open enrollment,[1] community-rated basis,[2] individual direct-payment HMO contracts and point-of-service (POS) contracts providing comprehensive and standardized benefits.[3]
At the time sections 4321 and 4322 were enacted, Insurance Law § 4308 required the Superintendent to approve all insurance *169 contracts as well as initial premium rates and subsequent rate modifications before they became effective. As is relevant on this appeal, subsection (b) authorized the Superintendent to disapprove proposed initial premiums upon finding that they were "excessive, inadequate or unfairly discriminatory" (see Insurance Law § 4308 [b]). After approval, premiums could only be modified after public hearings and the Superintendent's prior written approval, a lengthy and often costly process prescribed by subsection (c) (see Insurance Law § 4308 [c] [1]-[3]).
As part of the 1995 amendments, however, the Legislature enacted new subsections (g) through (j), dubbed the file and use provisions. Under the file and use methodology, insurers seeking to increase or decrease premiums may submit a rate filing or application to the Superintendent, which "shall be deemed approved, provided that . . . the anticipated incurred loss ratio for [the] contract form [falls within prescribed minimum and maximum loss ratios (between 80% and 105% for individual direct-payment contracts) as certified by an actuary]" (Insurance Law § 4308 [g] [1]; [j] [emphasis added]).
A loss ratio is determined by dividing claims incurred by premiums earned. The "anticipated incurred loss ratio" is an actuarial prediction of the loss ratio for the upcoming calendar year. Insurers annually report their actual loss ratio for the previous calendar year (see Insurance Law § 4308 [h] [1]). If the actual loss ratio is below 80%, the insurer must issue a refund to its subscribers or credit a dividend against future premiums by September 30th of the year following the year in which the loss ratio requirements were not satisfied (see Insurance Law § 4308 [h] [2]). Conversely, if the actual loss ratio exceeds 105%, the insurer must increase its premium rates accordingly (see id. § 4308 [h] [3]).
Because the file and use provisions require insurers to give each subscriber at least 30 days written notice of a premium rate increase (see Insurance Law § 4308 [g] [2]), insurers typically submit rate filings to the Superintendent and notify their subscribers simultaneously at year-end. A cap limiting premium increases or decreases to 10% per year was in force from 1996 through 1999 (id.).
By letter dated November 13, 2001, the Superintendent informed Excellus, which provides health care coverage in 45 upstate counties, that he was modifying his review procedures for certain file and use rate applications "to provide [him] with *170 sufficient time to make the necessary determination that the requested premium rates [were] in compliance with the requirements of Section 4308." The Superintendent also advised Excellus that premium rate adjustments for individual direct-pay HMO and POS contracts could "not be implemented until the [Superintendent's] review [was] completed and the company [was] so advised in writing"; however, Excellus "should continue to provide the required 30 day written notice to [its] subscribers based upon the requested effective date."
In late November 2001, Excellus submitted its rate filing for new premium rates effective January 1, 2002, accompanied by the required actuarial certifications. On November 30, 2001, the Superintendent acknowledged receipt of Excellus's submission; stated that the requested rates were being reviewed for compliance with section 4308; asked for further information; and cautioned that "the requested premium adjustments . . . may not be implemented until the [Superintendent's] review is completed and [Excellus] receives a written confirmation that the requested rates have been placed on file."
By letter dated January 10, 2002, the Superintendent notified Excellus that he had reviewed the rates and was modifying some of them by reducing increases and, in two instances, denying any increase at all. Excellus thereafter commenced this CPLR article 78 proceeding to challenge the Superintendent's actions.
Excellus argued that the Superintendent's actions ran afoul of the file and use statutory scheme by improperly conditioning a premium rate change on his review and approval. The Superintendent took the position that he acted properly because section 4308 (b) authorizes him to disapprove any premium that is "excessive, inadequate or unfairly discriminatory." He asserted that he properly reviewed Excellus's filed rates under subsection (b), given the "steep" increases and wide discrepancies in premium rates, the sharp decline in direct-pay subscribers and the largely competition-free insurance market involved. The Superintendent also argued that his review was necessary because many rate filings were based on extremely small populations, not reflecting a true basis for community rating. Since insurers use certain market stabilization mechanisms, which may provide them with additional funds to offset losses, the Superintendent further contended that he needed to verify whether the actuaries properly accounted for recoveries from these programs in their rate analysis.
*171 Supreme Court annulled the Superintendent's letters and determined that Excellus's filed rates were approved as a matter of law, effective on January 1, 2002. The Appellate Division unanimously affirmed, relying on a plain language analysis (303 AD2d 864 [3d Dept 2003]). The Court observed that "[h]ad the Legislature wished to require [the Superintendent's] subsequent approval of a rate filing or application, it could have done so through appropriate wording" and concluded that "[the Superintendent's] interpretation, however laudable its purpose, imports a policy not expressed in the plain words of the statute" (id. at 868). We granted the Superintendent leave to appeal.

II.
When interpreting a statute, we turn first to the statutory text as the best evidence of the Legislature's intent. "As a general rule, unambiguous language of a statute is alone determinative" (Riley v County of Broome, 95 NY2d 455, 463 [2000] [citation omitted]). Further, although an agency's rational construction of a statute is normally entitled to deference, "a determination by the agency that runs counter to the clear wording of a statutory provision is given little weight" (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 103 [1997] [internal quotation marks and citations omitted]).
Here, the "clear wording" of section 4308 (g) (1) unambiguously states that a rate filing or application submitted to the Superintendent "shall be deemed approved," provided that it is accompanied by an actuarial document certifying that the anticipated loss ratios fall within the statutorily prescribed range. Thus, once the Superintendent receives a new premium rate filing, accompanied by the requisite actuarial certification, the rates specified in the filing are approved by operation of law.
The Superintendent and the dissent would read the statute to mandate approval of file and use rates under the requirements of subsection (g) unless (and, in the case of the dissent, until) the Superintendent subsequently disapproves these rates as "excessive, inadequate or unfairly discriminatory," which is the standard under subsection (b). We decline to interpolate into subsection (g) an exception unexpressed by the Legislature. This reading of the statute would create a "forced [and] unnatural interpretation[]" of "shall be deemed approved" by making approval by operation of law, in fact, contingent upon the Superintendent's assent (see Castro v United Container Mach. *172 Group, 96 NY2d 398, 401 [2001]; see also McKinney's Cons Laws of NY, Book 1, Statutes § 94 [legislative intent must be ascertained "according to its natural and most obvious sense, without resorting to an artificial or forced construction"]).
Our interpretation comports not only with the statute's plain language, but also with its legislative history and overall purpose. In enacting the file and use provisions, the Legislature sought to "reform[] the costly and time-consuming system for the approval of [] premium rates . . . , allow appropriate rate increases to be implemented on a more timely basis and also help assure that rates are equitable" (Governor's Approval Mem No. 72, Bill Jacket, L 1995, ch 504, at 6 [emphasis added]). To implement timely rate increases that are fair to consumers, the Legislature established anticipated loss ratios as the gauge of reasonableness, and provided for automatic refunds or credits if actual loss ratios were less.
A letter from former Superintendent Muhl to the Governor's Counselnoting that the Insurance Department participated in the drafting of the bill and recommending its approvalemphasizes that the file and use methodology not only "ensures that appropriate rate increases or decreases will be implemented on a timely basis . . . and enables HMOs and insurers to recognize savings in administrative costs" but also "assures that rates are equitable" and "is beneficial to [both] consumers and carriers" (Letter of Superintendent Muhl to Honorable Michael C. Finnegan, Counsel to the Governor, dated July 19, 1995, Bill Jacket, L 1995, ch 504, at 15 [emphasis added]). Indeed, the Department's regulations state that using a preapproved loss ratio is a proper method to determine the propriety of rates:
"One method of determining whether benefits are reasonable, in relation to the premium charged, is to determine the percentage of the premium collected which is expected to be returned to all policy-holders in the form of benefits. This percentage of return is known as the expected loss ratio. In order to prevent the insurer from retaining an unreasonable percentage of the premiums collected for expenses, commissions and profit, minimum expected loss *173 ratio standards have been established" (11 NYCRR 52.1 [f] [emphasis added]).[4]
In short, the legislative history of the file and use provisions is consonant with the statutory language. Neither intimates that the Legislature expected the Superintendent to exercise his traditional rate review powers with respect to premium rates "deemed approved." The Superintendent protests that the file and use statutory scheme, unmoderated by his review and potential intervention, undercuts affordable health care for direct-pay customers. Even if this is so, we must hew to the statute's text. The remedy sought by the Superintendent on grounds of public policy lies with the Legislature, not with the courts.[5]
Finally, we note that the Superintendent may always act to ensure that initial contract terms and premiums are not "excessive, inadequate or unfairly discriminatory" under subsections (a) and (b) of section 4308, as previously discussed. He may review rates pursuant to the "excessive management salary" provision of subsection (b)[6] or the audit provisions of subsections (d) through (f).[7] The Superintendent may ensure that the file and use actuarial certifications are correct, and he may issue *174 regulations regarding how loss ratio certifications are to be prepared.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
GRAFFEO, J. (concurring in part and dissenting in part).
Since 1934, the Superintendent of Insurance has been authorized to review rates charged by health insurance providers (L 1934, ch 595). The majority nonetheless holds that the Superintendent may no longer review rate increases to determine whether they are excessive, inadequate or discriminatory when a health insurance provider uses the "file and use" procedure set forth in Insurance Law § 4308 (g). Because subsection (g) contains no language clearly stripping the Superintendent of this power, I respectfully dissent from that part of the majority's analysis.
Although I agree with the majority that by adopting the file and use procedure, the Legislature clearly intended to expedite rate increases for certain health insurance providers, I find nothing in the statute or its history supporting the majority's conclusion that the Legislature also intended to divest the Superintendent of his authority to review rates to determine if they are "excessive, inadequate or unfairly discriminatory" as authorized in Insurance Law § 4308 (b). In fact, the plain language of subsection (g) suggests otherwise. The Legislature merely referred to the file and use methodology as an "alternate procedure" to the lengthy and costly public hearing process required by subsection (c) of the provision. No mention was made of a new standard for reviewing ratesmuch less the elimination of the Superintendent's review authority altogether. And, critically, by its plain terms subsection (g) did not supplant or limit the Superintendent's authority under subsection (b) to review rates to determine whether they are excessive, inadequate or discriminatory.
Like the statutory language, the legislative history is devoid of any indication that the Superintendent's power to oversee health insurance rates was being diminished. The purpose of the 1995 legislation was to make health insurance more affordable and available for direct pay consumers (see L 1995, ch 504). The legislation created two new standardized health insurance products for these consumers, an HMO plan and a point of service *175 plan, and mandated that such plans be offered by certain health insurance providers, including Excellus. Governor Pataki, who submitted the reform package as part of his insurance program, stated that the legislation was intended to address problems faced by direct pay consumers, who had "limited choices" in health insurance coverage because most insurers did not offer direct pay policies (Governor's Approval Mem, Bill Jacket, L 1995, ch 504, at 5). As for those consumers who already had insurance, the Governor observed: "Because of continuing rate increases, this critical coverage is becoming more and more expensive for the existing policyholders" (id.).
The streamlined procedure for establishing rate changes was but one aspect of this comprehensive health insurance reform legislation. In discussing the new file and use method, the Governor noted that
"[t]he bill also reforms the costly and time-consuming system for the approval of the premium rates offered by HMOs and Blue Cross Plans on their community-rated business. At the same time, it also preserves certain consumer protections. The adoption of a file and use rating methodology for community rated contracts of HMOs and Article 43 corporations with minimum and maximum loss ratios will yield savings in administrative costs, allow appropriate rate increases to be implemented on a more timely basis and also help assure that rates are equitable" (Governor's Approval Mem, Bill Jacket, L 1995, ch 504, at 6 [emphasis added]).
It appears that the Governor expected the amendment to create an alternative to the costly, time-consuming public hearing prior-approval procedure of subsection (c) while preserving "consumer protections" that would help assure equitable rates. Since the subsection (b) standard provides the framework for assuring such protections for consumers, I am unpersuaded that the file and use procedure was intended to repeal that subsectionparticularly since the Legislature could have easily so provided.
Though not a model of clarity, the statute's provisions can be read together in a manner that gives meaning to each of its terms and effect to the overriding intent of the 1995 legislation. And where a statute's terms can be harmonized, the canons of statutory construction require that we do so (see generally, Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals, 97 NY2d *176 86, 91 [2001]). While the majority gives great weight to subsection (g)'s "deemed approved" language,[1] this is just one phrase in a lengthy statute. There is no basis to conclude that the "deemed approved" language vitiates the long-standing "excessive, inadequate or unfairly discriminatory" standard set forth in subsection (b). Both subsections can and should be given effect.
As I read the statute, the 1995 amendment offers insurers a more efficient and cost-effective means of securing rate approval. If rate increases fall within the minimum and maximum loss ratios established in subsection (g), the rates are "deemed approved," meaning that insurance providers can collect the new rates from consumers. Thus, under the file and use method, the Superintendent is precluded from requiring insurance companies to submit to prior review or approval by the Insurance Department before rate increases go into effect.[2] If the Superintendent decides to exercise his review authority under subsection (b) and finds that the rates are excessive, inadequate or discriminatory, the rates may no longer be charged prospectively, although the Superintendent's determination can be challenged in a CPLR article 78 proceeding (as occurred in this case).[3] This interpretation of the statute gives effect to all of its terms and is consistent with the history of the reform legislation as a whole and of subsection (g) in particular.
*177 Excellus' argument that the minimum and maximum loss ratios, used to calculate rates under the file and use procedure, will protect consumers from excessive or discriminatory rates does not withstand scrutiny. In the absence of the Superintendent's intervention, the file and use procedure has produced HMO rates for direct pay consumers that increased 69.3% between 1999 and 2002 (testimony of Gregory V. Serio, Superintendent of Insurance, before the New York State Senate Standing Committee on Insurance, Apr. 15, 2003). The climb in point of service contract rates was even more precipitous: 82.7% during the same time frame (id.).
In addition to resulting in exponential rate increases, the file and use procedure has apparently led to divergences in rates from county to county which, according to the Superintendent, are not justified by regional differences in health care costs. While the loss ratios restrict the percentage of rate increase adopted for a particular plan, they do not require that a provider take a uniform approach to rate increases from plan to plan or region to region. Consequently, as long as rate increases fall within the loss ratios, the file and use procedure does not prevent a provider from increasing rates 50% in one county and not at all in the adjoining county. Absent review, a provider could charge divergent rates without justification and compound the differences in the next filingeven if the rates are patently discriminatory.
Left unchecked, the file and use procedure can lead to precipitous rate fluctuations and unjustified regional discrepancies that could thwart the underlying purpose of the 1995 legislation. While the Superintendent retains the authority to order an independent management and financial audit under the majority's reading of the statute, audit review may come too late to meaningfully protect direct pay consumers who must meet premium payments each month. If this class of vulnerable insurance subscribers cannot afford the increased rates, they will drop off the insurance rolls and join the ranks of the uninsureda result completely contrary to the overriding legislative motivation to increase availability of coverage for direct pay consumers.
The Superintendent has alleged that misuse of the file and use procedure was precisely what prompted him to exercise his review authority to reduce Excellus' rate increases in January 2002. The merits of this determination were never reviewed because the lower courts each concluded that the "deemed approved" *178 language divested the Superintendent of rate increase review authority. Because I believe the Superintendent retains authority under subsection (b), I would remit this matter to Supreme Court to assess whether the Superintendent's prospective alteration of Excellus' rate increases was arbitrary or capricious, i.e., whether the Superintendent rationally concluded that the provider's rate increases were excessive, inadequate or discriminatory.
Order affirmed, with costs.
NOTES
[1] Under open enrollment, the insurer must provide health insurance coverage to all willing purchasers.
[2] A community rate is determined by the insurer's average cost per person in the relevant geographic area. Insurers consequently charge subscribers uniform rates regardless of individual health risks or medical history.
[3] Insurers are thus required to offer two forms of direct-payment contract: the usual HMO contract to cover statutorily specified services from hospitals and physicians approved by the HMO; or a point-of-service contract, where, in addition, the same benefits are available from the hospital or physician of the enrollee's choosing, typically covered at a percent of the fee.
[4] The Department's regulations establish specified loss ratios for different insurance products to ensure that rates are equitable. In many instances, those loss ratios are lower than the 80% allowed by the Legislature in the file and use context (see e.g. 11 NYCRR 52.15 [allowing loss ratios as low as 60% for specified disease coverage]).
[5] Notably, in recent years the Legislature has created or expanded several health care programs aimed at solving the complicated problem of New York's uninsureds (see L 1996, ch 639 [New York Health Care Reform Act of 1996]; L 1999, ch 1 [New York Health Care Reform Act of 2000]).
[6] Section 4308 (b) provides, in relevant part, that "[n]otwithstanding any other provision of law, the superintendent, as part of the rate increase approval process, may defer, reduce or reject a rate increase if, in the judgment of the superintendent, the salary increases for senior level management executives. . . are excessive or unwarranted given the financial condition or overall performance of such corporation."
[7] Section 4308 (e) provides that "[n]otwithstanding any other provision of law, the superintendent shall have the power to require independent management and financial audits of corporations subject to the provisions of this article whenever in the judgment of the superintendent, losses sustained by a corporation jeopardize its ability to provide meaningful coverage at affordable rates or when such audit would be necessary to protect the interests of subscribers." Section 4308 (f) provides that "[t]he superintendent shall have the authority to direct the corporation in writing to implement any recommendations resulting from the audit that the superintendent finds to be necessary and reasonable . . . Upon any application for a rate adjustment . . ., the superintendent shall review the corporation's compliance with the directions and recommendations made previously by the superintendent, as a result of the most recently completed management or financial audit and shall include such findings in any written decision concerning such application."
[1] In prior cases, this Court has interpreted a statute containing the phrase "deemed approved" in a manner consistent with and appropriate to its context. For example, in Matter of King v Chmielewski (76 NY2d 182 [1990]), we rejected the argument that a subdivision application was automatically approved by operation of law 45 days after the public hearing even though Town Law § 276 (4) provided that the application would be "deemed approved" if not acted upon within that period. Instead of reading the phrase "deemed approved" in isolation, we considered it in the context of other relevant provisions of law, declining to adopt a narrow interpretation of the statute that "would be inconsistent with the legislative design" (id. at 188; see also, Matter of Sun Beach Real Estate Dev. Corp. v Anderson, 98 AD2d 367 [2d Dept 1983], affd 62 NY2d 965 [1984] [Town Law's 45-day "deemed approved" provision must be harmonized with SEQRA's more extended review process]).
[2] This confers a significant benefit. For several years after the file and use procedure was adopted, the Superintendent apparently saw no need to exercise his review power at all and providers' rates were not disturbed once filed.
[3] Given my reading of the statute, I concur with the majority holding insofar as it annuls the Superintendent's November 2001 letter because it attempted to impose a prior approval requirement on providers who use the subsection (g) file and use procedure. I would also strike that portion of the Superintendent's rate review determination directing retroactive application of the Superintendent's rate modifications.